Thank you very much. The next case is number 2012-5033, CASITAS MUNICIPAL WATER DISTRICT v. United States. Mr. Maradona. In 1944, the Ventura area was hit with a drought that lasted almost a decade. As a result, the municipal wells for the city of Ventura went dry. Irrigation wells in Ohio Valley also went dry. And indeed, the reclamation projects at Kachuma and at McTilgahaw, which had been constructed in the wake of an earlier drought. Mr. Maradona, this case has been here before. It has, Your Honor. And the determination was that if there's a taking, it's physical, not regulatory, right? That's correct, Your Honor. And it was sent back to the Court of Federal Claims. And the Court of Federal Claims said it wasn't right yet. Correct, Your Honor. Because there was enough water to supply the use, which was the license that CASITAS had gotten from the state of California. Is that right? Not precisely, Your Honor. So why was it? Well, strike me out and also tell me why the claims court was wrong. Certainly, Your Honor. What the trial court did on remand was to fail to apply this court's rubric of physical taking, to ignore the terms of CASITAS water license. Instead, the court adopted the view, Your Honor, that there was this notion of beneficial use, which was measured by whether or not the amount of water that CASITAS could deliver to its customers was, as the court put it, quote, constrained. That is, at what point could CASITAS no longer provide water to its customers? And the court found that that had not occurred. Yes, Your Honor. And that that was the reason the case was not right, that it would become right at the point that there was no longer sufficient water in the reservoir for CASITAS to service all its customers. Let me ask you. It seems to me that the parties and the Court of Federal Claims are in agreement that in California, beneficial use is the measure of the property, right? Is that correct? The parties agree. I mean, that seems to be undisputed. Well, yes, Your Honor, properly understood. Okay, now, is it your position, though, that beneficial use is defined, in this case, by the license, and that the license gives CASITAS the right to take 107,800 acre-feet out? Precisely, Your Honor, that beneficial use is defined in a number of ways. The opposite of beneficial use, of course, is waste or unreasonable use. If it's not a beneficial use, then you can't have a right to that water. But you're saying, by its terms, the license gives the right to 107,800 acre-feet, correct, of beneficial use? Well, up to that amount, yes, Your Honor, in diversions in a given year. Now, what about, though, the fact that the license also says the total amount of water to be put to beneficial use should not exceed 28,500 acre-feet per year? Excellent question, Your Honor. And that is the point of understanding the climate in the central coast of California. Between 1944 and 1953, for 10 years, the drought continued to the point that nobody had water. All of the wells and the existing reclamation projects went dry because there wasn't rain. That is, let us not think of the Ventura River as a flowing river like the Potomac. Rather, it is dry most of the year. Yes, there are pictures in the record. Yes, and we tried to illustrate that, and I think it was illustrated by the testimony in Swelling Rock. So, the general rule is that CACITAS needs to capture the water when it can. That was understood by Congress when it passed the Ventura Project Act. It was understood by the State of California when they issued a license that authorized diversions that are almost four times the maximum beneficial use. I'm sorry, excuse me. Are you saying that diversion and beneficial use, in this case, are the same by reason of the license? What I'm saying, Your Honor, is that as the license is titled, License for Diversion and Use, that the diversion is for the beneficial use of the water. The trial court, I think, went awry when he defined the issue as make the CACITAS divert water, not for a beneficial use. We've never claimed that, and of course it would make no sense. What the trial court ignored, Your Honor, is the important beneficial use stated in the license of emergency standby use. That means storage. Well, it means storage, Your Honor, and it means storage, the word emergency. It means storage not only for CACITAS' existing customers, which is all the trial court looked at. It also means storage for surrounding communities, the City of Ventura, the Ojai Valley, whose use doubles when drought occurs because the groundwater from which they get their regular water dries up. Just saying, the fact that they were able to serve existing customers did not mean that they exhausted beneficial use rights. I'm not sure I quite, I don't think I can agree with that statement, Your Honor. One of the beneficial uses is to have water in the reservoir when the drought comes. Mr. Barnett testified about the drought of 1986 through 1990 when over a four year period, the reservoir level dropped by almost half, over 100,000 acre feet in four years. In other words, satisfying current needs was not good enough. Not satisfying the regular customers is part of what the reservoir was built for and part of what the license authorizes. The other part, which the court ignored, is to provide emergency standby use. And the license also says recreational use, fishing and boating, over a million feet. Has that emergency standby use ever been called into play? Yes, Your Honor. In the drought that I just mentioned, 1985 through 1990, additional water was supplied to the city of Ventura. Additional water was supplied to the Ojai Valley. In 2009, as Mr. Colt has testified, again the wells went dry in the Ojai Valley and that's an agricultural area. The farmers turned to the water that was in Cacifas Reservoir in order to provide water for their orchards. And were all these needs met? They were fortunately met. We have not seen another drought like the one that occurred in 1944 through 53, the one that occurred back in the 1918 through 25 or thereabouts era.  So what you're saying is that although this more recent drought after the facility was constructed, the needs were all met, still Cacifas was deprived of having on hand water to meet more needs? Cacifas is deprived of having the water on hand for when this unpredictable drought occurs. That was ignored. The court didn't even examine that, Your Honor. What the court said is you've been able to deliver to your regular customers. That's all I look at. The court relied on the government's report from Mr. Spencer, the government's expert, Mr. Spencer, who only looked at regular customers. Neither the court nor the government's expert ever looked at or considered whether Cacifas has sufficient water on hand to provide for the big drought when it comes, which is what the water license authorizes. So you're saying beneficial use involves, which is the measure, involves having on hand water necessary to meet a future drought possible. It's a drought emergency. It's like having water. So it's storage, as Judge Lurie said earlier. Well, yes, exactly, Your Honor. It's like having water in the fire hydrant. If there's no fire, it doesn't matter whether there's water in the fire hydrant. Well, what's the maximum? Is it 107 or 28? 28 is for beneficial use, but we're defining, they're trying to define beneficial use as including storage, which can go up to 107,000. A little confusion of prognology. Your Honor, the rainfall in the Cacifas area ranges from 10 inches a year, which is almost desert conditions, to 40 inches a year, which is pretty close to what we have here around Washington, D.C. Year to year, you don't know how much water you're going to get, and that's why the storage reservoirs are constructed. You'll notice that the delivery for beneficial use is 28,500, delivery from direct diversion or storage. The only way you can get that water is from storage, because there is no rain and the river is dry from about March or April to November. Help me understand where the Court of Federal Claims said that it wasn't ripe. There's no issue that there has been, from the beginning, adequate water for the fish ladder, and I gather there's no issue that there hasn't been enough water in the reservoir to meet the situations up to now. So it looks as if the Court may be concerned as much with how you measure whatever injury, rather than the threshold question of whether the obligatory construction of the fish ladder led to some sort of taking. Is that a fair representation of what happened? I think, Your Honor, that you're on the right trail, and that is that the trial court simply ignored what this court held the first time around. That is that the water that was in Casitas Canal, the Robles-Casitas Canal, on its way to the reservoir, is rerouted down the fish ladder, down the river out to sea, forever lost to Casitas. The trial court said, I don't care about that. What I care about is whether the water that has gone through the canal has been stored in the reservoir, has been sufficient during this relatively short period of time. The fish ladder went into operation in 2005. Whether it has been sufficient between 2005 and the time of the trial in 2010, 2011, to allow delivery to Casitas regular customers. But I'm not sure, one thing you said, Mr. Marzullo, I'm not sure that what the trial court did was inconsistent with our prior ruling. We said there was a physical taking in that, if you want to put it simply, molecules of water were diverted via the fish channel away from the channel running to the reservoir. That was physical removal of water. But what the Court of Federal Claims had to do on remand was determine whether there was a compensable taking here. In order to determine whether there was a compensable taking, it had to look to the nature of the property right under California law. The court may or may not have gotten that right, but I don't think you can say that what it did was inconsistent with the prior decision. In other words, it's analytical approach. Well, here's my concern about that, Your Honor. First of all, I think the trial court was wrong because, of course, Casitas has instituted conservation measures. It's cut back on the water it is delivering to its customers. It has purchased and distributed low-flow shower heads at some cost. It has purchased and distributed low-flow toilets. They have refused to renew leases in the watershed, which were people on a waiting list because they didn't have water for them. They've raised the cost of hookups. It costs over $18,000 an acre foot to hook up to Casitas Water Service now. They've done all of those things to decrease the amount of water being delivered to the customers. They've done that in light of the constraints on their water supply because they operate under a water budget, if you will, that's called safe yield. The way we presented the case to the court is the safe yield, that is the amount that will safely be withdrawn from the reservoir each year, has been diminished. There's no question about that because water that would have gone into the reservoir now goes down the fish ladder. No question there's less water in the reservoir. So the board, as it distributes that water, diminishes the amount of water being provided to the customers and doesn't take new hookups precisely because they know they don't have the water to do that. So the vice in the court's determination is that the court says, well, as long as Casitas is able to operate within having a constrained water supply, even less water, there still is no taking. And if that taking were increased, I suspect the board again would decrease the amount of water that it is providing to its customers, would impose even greater conservation measures, and so you would find even less water being delivered to the customers. But the court has said, the trial court has said, until you actually aren't delivering water to your customers, the case is not right. And we've cited the Hage case, the state of Hage, the Fellini case in which the court has said, and we think that's what this court said in its first appeal, that it is the governmental action, in this case the biological opinion, in the Hage case the construction of fences, in the Fellini case the passage of the Wild Horses Act, it is the governmental action on which the cause of action accrues. And, Sargeant, let me ask you one question because I've looked at the top of your time, it's probably getting near on your main argument. Yes, sir. The trial court found that the measure of beneficial use was the 28,500 feet, okay? No, it didn't. Well, isn't that what he... No, what he said is the measure is what your customers get sometime in the future. And until there's a decreased amount of water, when the customer can turn on his water and the water doesn't come out of the faucet. But I thought he was focusing on the 28,500 acre feet. I don't think so, Your Honor. That's the maximum under the license for beneficial use. Well, it is, Your Honor, I'm glad you raised that. With this exception, toward the end of the license you'll notice that it says except in case of emergency, referencing back to emergency standby, which is when procedures will supply water not only to its regular customers. Well, that's where the 107,000 comes in. I'm sorry, Your Honor. Because that includes storage. No, but if I might, Your Honor, let me explain for emergency use. The 107,800 is the maximum amount that may be taken out of the Ventura River in any given year. And that water goes into storage in the lake, Casitas Lake. 28,500 is the amount Casitas may normally deliver to its customers out of the water stored in the lake. I don't think you were disagreeing with the premise of my question. I'm sorry, Your Honor. Perhaps I misunderstood. Your time is up, so I won't keep pressing you. Thank you, Your Honor. Okay. Let's hear it from the government. It will save you some time for rebuttal. Thank you, Your Honor. Ms. Barton, may it please the Court. Casitas asks for $87 million, although it has never been denied the beneficial use, never shorted its customers any water. Its reservoir was full as of 2006. It's speculative whether it will ever use the water. But aren't we governed by the license? And the license defines beneficial uses, including standby emergency use. And for that, there is a maximum amount of acre feet. Isn't that what we have to look to? First of all, Your Honor, there was a trial in this case. This case, an eight-day trial. And post-trial briefing, this case has gone basically all the way to the end, to a conclusion that... I think you should answer the question. I am. I am. And Mr. Modula never, was never presented to the trial court judge that standby emergency use was at issue. And there was no evidence presented about how much... Because that's what the reservoir is for. Right. No, the standby emergency use is special use in a particular drought situation. But let me... And there's no evidence of... Let me take it this way. You look at their own expert report... You're saying we're inquiring about a case that wasn't tried below. That's correct. That's correct. The trial court judge made findings of fact on whether beneficial use had been infringed. And if Mr. Modula, the casitas must show that they are clearly erroneous. There's nothing in the record about standby emergency use. But let's go on beyond the very important technicalities. You see this is his own expert. If you look at page 1229 of the joint appendix, I think that's where it is. There is a chart of how much actual water they have delivered year by year. And that amount of water has never even reached the 28,500 allowed in the license. So there is absolutely nothing to show that they ever would or will need that emergency standby water. I think it's important to understand how this project operates. This is an unusual situation. It's a big project. 60% of the water comes in not from the Ventura River, but from rain and Coyote Creek and other tributaries. They divert water from the Ventura River when they can generally. But the Ventura River has a lot more water that flows in it than they traditionally divert, an average of 11,000 acre feet a year. A hole over the period that our expert looked at, I think since the 60s, enough to fill the reservoir one and a half more times. So the diversion of the water to the fish ladder is made up for over time by the availability of that extra water. In fact, over the past 35 years, since the reservoir first filled to full in 78, it spilled or reached capacity because they stopped trying to allow it to spill at least seven times over those past 35 years, which means it fills to capacity every five years. And every time it does, any lost diversions from the fish ladder are wiped out. Once it's full, it's full. And it doesn't matter what happened in the past. And that's why it seems very, very speculative whether you have to have an extreme drought for there ever to be a situation where there isn't enough water, but the diversions matter. Now, I mean, it's sort of an unusual situation, right? The diversion to agriculture for irrigation, usually you have diversion, and if you can't divert, you can't put the water on your land, right? It's an unusual case. I don't know if there are a ton of cases that this case will matter for, but where the time between and sort of the effect is attenuated, right, between the diversion and the use of the water. And in between, and that attenuation allows for the water to be made up. And that's why Judge Weiss, after eight days of trial and carefully analyzing everything in the record, determined correctly that they had not shown infringement on beneficial use. And I actually think the Hage case is helpful for us in this case. And you're saying beneficial use doesn't include storage for some indeterminate speculative possibility in the future. Exactly. And certainly they have a right to store the water, but it's subject to it being beneficially used. And since, especially in a physical takings case, right, the thing the government has to do is seize property. And it's not, you don't know that the property is the use of factory right. The government has to have actually prevented use. And the use of factory right does not include just storage. It does include storage for the future, but just as a diversionary right. So you would say, Ms. Barton, the seizure of the water here, which took place, the physical taking, did not result in an impingement on the use of factory right. Right. Okay. Let me ask you, what is the, assume for the moment that you had a situation where Casitas was just barred from diverting any water, yet it could meet the needs of its customers. I realize that's not the case here. We're not saying it wasn't barred from diverting any water at all. But would Casitas have some kind of a contract claim under the, in your view, under the license, saying you prohibited me from diverting any water? Well, I don't know under the contract as this is written, but this is a claim of infringement on their water right. I don't think they, they still would not have a claim for infringement on their water right. If you think of the government, you know, they made them build a new diversion facility somewhere else, that could be a more contractual kind of interference. There could be property rights in other aspects that are not part of, that are not the water right, which is a use of property. But that's not what type of issue it is. But the license just says that Casitas can divert up to 107,800 feet, but it's the government's position, and I understand Judge Weiss found, that there was no impingement on the right to beneficial use of up to 28,500 acre feet. Is that correct? There was, there was no, there has been no impingement on their beneficial use at all. And that's measured by the 28,500? No, it's measured by what they're actually using. I mean, whether they're using it. And they never have delivered 28,000. So, I mean, clearly they haven't suffered an impingement up anywhere, up to that 28,000. In other words, the taking requires a loss. Exactly. And that's exactly what the Hage case held, actually, was that the water was fenced off. They couldn't, the ranchers couldn't bring their cattle to the water. But they didn't show that they didn't have beneficial, enough beneficial use of water elsewhere. And that's just like this case. Right? Their ability to divert is somewhat blocked off. Although we contend, and our experts show that it's made up at other times, but they haven't shown that they have suffered any loss of beneficial use. Well, there's no doubt that they lost water. You're saying that it was not measurable because it didn't impact the uses that Casillas was putting the water in. No, actually, there, excuse me, but there is doubt that they have lost any water. In fact, because as I said, there's enough, there's more water available to fill that reservoir, even with the fish bladder diversions. They don't need all that water. That's what our experts show. And Judge Reese, actually, I mean, when you read his analysis, he agrees that it's speculative whether they will ever lose the loss of water, but even under their own analysis, their own experts' analysis says they will have enough water to meet projected demand under their theory of delivering safe use unless an upstream dam is removed, which is compelling. It's measured because the reservoir was always full, but we were told that at times of drought, the reservoir is significantly depleted. The reservoir is depleted. Do you know that the diversion we're talking about to the fish bladder is about 1% of their store? I mean, it's a very small amount of water. So we're not talking about a huge infringement. Over time, it accumulates, and we're not saying it doesn't matter, but it turns out that actually in the expert report, I think it said in 2004, the reservoir got down to 157,000 acre-feet, something like that, down almost 100,000 acre-feet. In 2005, it was filled to capacity. That's what a storm year, basically an El Nino period in California does with that reservoir. Are we reviewing a question of fact, or are we reviewing the meaning of a license, like a contract, and determining whether beneficial use includes speculative future emergency use? Because the purpose stated in the license is for municipal, domestic irrigation, industrial, recreational, and standby uses. That is the purpose. And so is it that we're trying to determine what's a beneficial use under the license, or are we reviewing facts? I think it's not necessary for the court to reach how much water is necessary for standby use in this case, because there's no proof that it has been infringed. A takings case is not injunctive.  It just says that once we've taken it, we will pay you. And they can come back in the future. They can come back in the future. Exactly. I think I've addressed most of the things that Mr. Marzua stated. Let me do say that Mr. Marzua identified a number of infringements that he contended have occurred on beneficial use. The ones relating to conservation were presented to the trial court and are answered in our brief. It's just general conservation measures. They haven't accelerated anything. And, in fact, the reservoir was full in 2006, so we're not talking about serious conservation measures. Anything has been done different because of the biological opinion. They have not shown that that's clearly erroneous. And every other element that I think Mr. Marzua mentioned was not before the trial court. There was not a lease before the trial court. The hookups don't have anything to do with the biopsy and the fact that it cost money. If I could ask you one question. The last paragraph of the license provides that upon a finding of emergency caused by drought, et cetera, casitas during periods of deficient water supply may withdraw additional water in excess, I think, of what's presently allowed. Is that correct? It does say that. In the last paragraph, the licensee may exceed the amount of water authorized to be placed to beneficial use under this license for the duration of the emergency. Correct. Now, how does that, in your view, play into the issue before us today as to what it's been taking? In other words... There haven't ever been any such conditions invoked, certainly since the biological opinion or the versions started, and they have never even reached the 28,500... The reason I asked it seemed to me that, and I could be completely wrong, but that it would be difficult for there ever to be a compensable taking if their needs exceed the 28,500, but they could put more to use if they had to. I think the taking is not to damage my case, but truthfully, the taking is not based on the 28,500 acre fee. That's rather a sort of, at this point, hypothetical number. I mean, they can't exceed it, but they never have even attained it. So the question is really whether they can't serve their customers somewhere up to that level, or if they have a drought emergency and need to exceed it, then they can show that that happened and have a right claim, or at least claim a right claim. Thank you. Any more questions? Thank you, Ms. Martin. Thank you. Mr. Mercer, will you have your rebuttal time? Thank you, Your Honor, and I will be brief. In response to the government's suggestion that we did not try the emergency backup use issue, I would cite to the testimony of Mr. Word, found in Joint Appendix 3073-74, or to the testimony of Mr. Wickstrom, found in the Joint Appendix at page 3524-26, as examples. I think the court is... As examples of what? As examples of both of them testified that the purpose of the license and the construction and operation of Cacivas Reservoir is to provide for emergency backup use. That's in the contract. That's in the license. Exactly. I was responding only to the government's statement that we didn't try the case or didn't raise the issue. The real issue, I think, before the court is whether the property right is the license issued by the State of California, which, in our view, defines the nature and extent of Cacivas water rights. And that says, as you know, our right to divert 107,800 acre feet a year, our right to use, for beneficial use, 28,500 a year. Or whether Cacivas right is, as the government and trial court found, only the water that Cacivas, in the future, years after the diversion, delivers or can't deliver, somehow you measure it, whether it can't deliver or doesn't deliver, to its customers. There is no case defining the water right as the trial court. The government has done so. There is lots of California law. We've cited all those cases. Are you arguing for a future taking that hasn't yet ripened? No, Your Honor. That is the point. The water right is a present right. If Cacivas does not have the right to divert 107,800 acre feet a year out of the Ventura River, then the diversions Cacivas is doing today are unlawful. If Cacivas is diverting water out of the river to put into the reservoir that is not for beneficial use, that is an unlawful act under California law. That is the import of the court's ruling. The court has amended Cacivas license without the notice and hearing, without going to the state water board. The court has said, I don't care what the state of California has told you, you're probably right. I'm telling you it's something different. It is measured by a future date. There's a difference between construing a right and finding it taking, isn't there? Certainly there is, Your Honor. But the step two in the analysis flows from the former. The court found that Cacivas' right was only the beneficial right to deliver to its customers. It's just like saying, if you own a piece of property but you're not using it right now, the government can take it, and you're taking it at some future time when you decide that you actually do want to use the piece of property. The court got the property right wrong, and that's why the court got this analysis wrong. If the property right is not the license, Your Honor, then it is a nebulous notion of water that sometime in the future can't get delivered to Cacivas' customers, or, heaven forbid, a drought comes, the water isn't in the reservoir, and people don't have water in their homes. Any more questions? No questions? Thank you, Mr. Wurzer. Thank you, Ms. Barton. Thank you, Your Honor. The case is taken under submission.